UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CYNTHIA BIMBERG,

                Plaintiff,

                                                  Case No. 11-10198

v.                                              Honorable Thomas L. Ludington

ELKTON-PIGEON-BAY PORT
LAKER SCHOOLS,

                Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT SUMMARY JUDGMENT**

The Americans with Disabilities Act, among its protections, prohibits employers from discriminating against employees because of their "relationship or association" with a disabled individual. 42 U.S.C. § 12112(b)(4). In pertinent (if somewhat cumbersome) part, the Act provides that employers are prohibited from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id*.

Alleging association discrimination, Plaintiff Cynthia Bimberg has brought suit against her former employer, Defendant Elkton-Pigeon-Bay Port Laker Schools. Defendant forced Plaintiff to resign her position as a school bus driver, she contends, because of the known disability of her husband, who was diagnosed with brain cancer. Defendant responds that it terminated the employment relationship not because of Plaintiff's association with a disabled person, but because she did not meet the attendance requirements of her job. After Plaintiff's year-long unpaid leave ended, she did not return to work.

Defendant now moves for summary judgment. ECF No. 12. Under the Act, as interpreted by the Sixth Circuit, if an employee "violates a neutral employer policy concerning attendance . . . he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled] spouse." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (quoting H.R. Rep. No. 101–485, pt. 2, at 61–62 (1990)). Unlike the reasonable accommodation protections provided to the disabled, able-bodied employees who have an association with a disabled person are not entitled to accommodation of the disability. *Id*.

In this case, the undisputed evidence establishes that Defendant terminated the employment relationship because Plaintiff did not return to work when required, violating Defendant's neutral attendance policy. And Plaintiff offers no evidence that her husband's disability factored into Defendant's decision. The reason that Plaintiff was absent from work was not an issue for Defendant — the issue was that Plaintiff was absent for more than a year. Accordingly, Defendant is entitled to summary judgment.

**I**

Plaintiff began driving school buses for Defendant in 1993 as a substitute driver. Three years later, she became a full-time driver. In 2007, Plaintiff became a member of her local bus drivers' union, the International Union of Operating Engineers Local 547. Two fellow school bus drivers, Carol Suttkus and Dawn Urick, were her local union stewards. The international union representative was William Howard.

On January 1, 2008, Plaintiff married Kenneth Bimberg. In June 2008, Mr. Bimberg felt a lump on his shoulder. It was melanoma. He began receiving treatment at the University of Michigan. When the 2008–2009 school year began, Plaintiff resumed work, taking time off as needed to transport Mr. Bimberg to his appointments. Sometime during this period, Plaintiff

contends, Ms. Suttkus remarked "that I purposely got Ken sick so I could have a vacation." Pl.'s Dep. 27:13–14, May 10, 2011, *attached as* Def.'s Mot. Ex. 1.  Although Plaintiff was offended, she did not bring the comment to Defendant's attention.

Mr. Bimberg's treatment, sadly, did not eradicate his cancer.  In November 2008, doctors determined that the cancer had metastasized to the brain.  Plaintiff then approached Ms. Suttkus in her capacity as union representative for assistance in lobbying Defendant for an unpaid leave of absence to care for Plaintiff's husband.  Ms. Suttkus brought Plaintiff's request to Plaintiff's supervisor, Dawn Rosenthal, who, in turn, brought it to Defendant's superintendent, Robert Smith.  Plaintiff recalls that "two or three meetings" were then held about the issue in November 2008.  Pl.'s Dep. 33:13–15.

Defendant's policy regarding unpaid leave for family health crises is set forth in § 5357 of Defendant's personnel policy, which provides in pertinent part:

> Employees with at least 1 full year of service and at least 1,250 hours of work in the last 12 months are entitled to unpaid leave of up to 12 weeks in any one-year period for the birth/adoption of a child or for serious personal or family health reasons. . . .
>
> Upon conclusion of the leave, the employee shall be returned to the same position or an equivalent position.  If the employee does not return as scheduled, termination from the position may result.

Def.'s Mot. Summ. J. Ex. 4, at 1, ECF No. 8 ("Def.'s Mot.").   Notwithstanding the policy's capping an unpaid leave at twelve weeks, a "letter of agreement" was executed that provided in pertinent part:

> This Letter of Agreement is the full and complete resolution to the Cindy Bimberg request for an unpaid leave to attend to her spouse's emergency medical needs commencing January 5, 2009 and expiring on the last student day of the 2008-2009 school year [i.e., early June 2009]. . . .

> This constitutes the entire understanding of the parties.  This Letter of Agreement shall not be deemed precedent setting.

Pl.'s Compl. Ex. B, ECF No. 1.  Thus, rather than twelve weeks, Plaintiff was granted more than twenty weeks of unpaid leave.  Ms. Suttkus (as a union representative) and Superintendent Smith signed the agreement on November 12, 2008.  Plaintiff did not.

In December 2008, the Bimbergs learned that they would have to travel to Texas in order to attempt to treat Mr. Bimberg's cancer.  December 18, 2008, was the final day Plaintiff worked for Defendant before departing for Texas.  That day, another copy of the letter agreement was executed.  This time, Plaintiff signed it, as did Ms. Suttkus and Superintendent Smith.  *See* Def.'s Mot. Ex. 6.

In January 2009, the Bimbergs left for Texas.  Several months passed.  Mr. Bimberg's condition did not improve.  In May, Plaintiff returned to Michigan to meet with Defendant to request an extension of her leave of absence.  On May 5, 2009, Plaintiff testifies, she met with Superintendent Smith and Ms. Rosenthall and the leave was extended.  "[H]e told me I had until January 4," she recalls, acknowledging that this understanding was not reduced to a writing.  Pl.'s Dep. 43:17–23.   She further recalls that when she met with Superintendent Smith and Ms. Rosenthal, "he said something about, well, you have such a nice tan, must be great to go down south for the winter or something like that he said.  I don't know his exact words."  Pl.'s Dep. 28:18–21.

Superintendent Smith denies the "going south" remark.  He acknowledges that Plaintiff's leave of absence was extended,  but asserts that the extension was only for one calendar year from the date Plaintiff last worked (that is, until December 18, 2009).  "You go and take care of your husband and we'll take care of the details," he testifies that he told Plaintiff, cautioning:

"Just make sure you're back on December 18th." Smith Dep. 13:25–14:2, May 24, 2011, *attached as* Def.'s Mot. Ex. 5.

Ms. Rosenthall likewise denies that Plaintiff's leave was extended to January 4, 2010. "At any time did you talk to her about returning on January 4th?" Plaintiff's counsel asked. Rosenthall Dep. 10:14–15, May 24, 2011, *attached as* Def.'s Mot. Ex. 9. "No," she responded. Rosenthall Dep. 10:16.

Following the meeting, Plaintiff returned to Texas. Later that month, Superintendent Smith met with Plaintiff's union stewards, Ms. Suttkus and Ms. Urick. Memorializing their conversation, he drafted a memorandum dated May 27, 2009, that recounted:

> This Thursday morning, I met with you [Ms. Suttkus] and Dawn Urick to discuss extending Cindy's medical leave. As you recall, we signed a letter of agreement on November 12, 2008 to grant her a leave of absence until the last student day of the 2008-2009 school year.
>
> Although it is not clearly outlined in the current contract, and, in fact, no [sic] there is no option for unpaid leave, I agreed that the new contract that is nearly completed [sic] and we would extend a year's leave of absence in accordance with the new language. Since Cindy's last day of work was December 18, 2008, it was agreed that she had to return by December 18, 2009, the day before the upcoming Christmas break.
>
> Hopefully Ken will respond positively to treatment and Cindy will return to work on December 18, 2009.

Def.'s Mot. Ex. 7. Superintendent Smith sent copies of this memorandum to Ms. Suttkus and Ms. Urick. He did not, however, send a copy to Plaintiff.

Instead, Ms. Suttkus asserts that she notified Plaintiff. "Right after the meeting," Ms. Suttkus testifies, "I called Cindy and then I mailed her a copy." Suttkus Dep. 14:5–8, Aug. 9, 2011, *attached as* Def.'s Mot. Ex. 2. Ms. Suttkus testifies that the two spoke several times over the summer of 2009, recalling:

> I talked to her several times over the summer. In the summer I team drive with the [sic] my ex-husband in the 18-wheeler and I talked to Cindy in all the states up and down the eastern seaboard telling her, Cindy, you need to be back — if you get back in Michigan for any reason, stop and talk to Mr. Smith. Because she kept telling me she wasn't sure when Ken was going to be better.

Suttkus Dep. 17:6–12. Plaintiff testifies that she did not receive a copy and further asserts that Ms. Suttkus did not telephone her about the meeting.

In September 2009, Plaintiff asserts, she met with Superintendent Smith, recalling he informed her that nothing had been finalized:

> I told [him] that Ken had to be down in to Texas. He was going to be under two chemo therapies and we're required to stay there for six months. . . . I even asked him, I even told Mr. Smith [sic] and Mr. Smith told me not to worry about it, go down there. They will — we'll see what happens. If you need more time I'll give it to you, that's what he said.

Pl.'s Dep. 49:22–50:12.

Around this time, Ms. Suttkus testifies, she brought Plaintiff's predicament to the attention of the union business representative, Mr. Howard. In her deposition, Ms. Suttkus was asked:

> Q: Were you concerned that Miss Bimberg [sic] would not return to Michigan on time?
> A: Yes, I was.
> Q: Do you know when you first had that concern?
> A: When school started back that year, yeah.
> Q: So that would have been the beginning of the 2009-2010 school year, correct?
> A: That's correct.
> Q: And do you know why it was you had that concern that she would not return?
> A: Because she'd keep telling me that Ken wasn't getting better and I'd keep telling her, Cindy, you have to be back. This is your job.
> Q: All right. And then Mr. Howard took over the handling of this matter, is that correct?
> A: Yes. But Cindy still called me occasionally.

Suttkus Dep. 18:3–18. Mr. Howard confirms this timeline, elaborating:

> A: In September or October on a prior visit I had been made aware that it was probably something I would have to get involved in.
>
> Q: Okay.
>
> A: I thought things had been resolved because I didn't hear anything too much before I did have a conversation, I recall, with Superintendent Smith asking him on a couple of occasions to extend a little more courtesy because of Cindy's husband.
>
> Q: Okay.
>
> A: And then I still had hopes, I guess I'm always an optimist, I still had hopes that things would be okay. But around the 8th or 9th [of December 2009], it was about the 8th of December Carol [Suttkus] let me know that she was going to be giving Cindy my contact information.
>
> Q: Okay.
>
> A: And almost immediately is when the conversation started.
>
> Q: Okay. And the reason that Carol was forwarding on your contact information to her was what, if you know?
>
> A: She felt she couldn't get Cindy to understand. She felt Cindy needed to be back by the 18th and she wasn't getting through to her.
>
> Q: All right. And was it your — you were aware that those conversations had been ongoing for several months, correct?
>
> A: Longer than that. . . .
>
> Q: And also beginning with your first contact, either December 8th or 9th, 2009, you had direct communication with the plaintiff that her leave of absence was set to expire on December 18, 2009; is that correct?
>
> A: Yes, sir.

Howard Dep. 10:9–11:11, 12:11–16.

On December 9, Plaintiff wrote to Superintendent Smith, forwarding copies to Mr. Howard and Ms. Suttkus. Asking for an extension of her unpaid leave of absence, Plaintiff explained:

> My husband is on a [sic] experimental chemo program. This is only available at M.D. Anderson, because the drugs aren't approved by the F.D.A.
>
> The drugs weakens [sic] him and causes other problems.
>
> I would like to extend my leave to the end of the school year or any extension would help. If there is any improvement in his condition I could come back sooner.

Def.'s Mot. Ex. 8. Defendant's counsel, inquiring about this correspondence, asked Plaintiff:

> Q: And the beginning of the third paragraph states, "I would like to extend my leave to the end of the school year or any extension would help." You see that?
> A: Uh-huh.
> Q: And that was a request to extend your leave to what point in time?
> A: Any extension would have helped or I would have liked to have had it in March [2010], but Mr. Howard told me to write this letter and he told me to ask until the end of the school year and maybe [Superintendent Smith] would give me until March.
> Q: Meaning June of 2010, correct, the end of the school year?
> A: Yes.
> Q: And when you wrote this correspondence . . . to Mr. Smith, you knew that the district had called you back to work for December 18, 2009, correct?
> A: No. They were still thinking about it. They didn't say yes or no.
> Q: When did you first become aware of December 18, 2009 being your return to work day?
> A: Positively the day before.

Pl.'s Dep. 98:7–99:4.

Defendant did not respond to Plaintiff's letter. Nor did Plaintiff's union representatives. Plaintiff remained in Texas. On December 17, 2009, Plaintiff called Mr. Howard. When she inquired about the status of the requested extended leave, he responded he "didn't think Mr. Smith was going to extend." Howard Dep. 18:14. Plaintiff then called her supervisor, Dawn Rosenthal, and requested an excused absence for the following day, December 18, which was the final day of school before the winter holiday. Her request was not granted. Plaintiff, again, remained in Texas.

On December 18, Plaintiff did not report to work. That morning, she telephoned Mr. Howard. He informed her that he had spoken with Mr. Smith, who was preparing to mail a letter terminating her employment — this much Plaintiff and Mr. Howard agree upon. Plaintiff and Mr. Howard disagree, however, about which one of them then raised the subject of resigning and the consequences that would follow. Plaintiff asserts "He told me I should resign because it would be in my best interest. . . . [I]t would look better than being terminated." Pl.'s Dep.

123:1–2, 123:5–6.  Mr. Howard asserts that he did no such thing, recalling: "[S]he said, could I resign[?] . . . it would look better on my record."  Howard Dep. 19:12–13.  Plaintiff and Mr. Howard also disagree about the subject of Plaintiff's pension.  Plaintiff asserts that Mr. Howard informed her that termination would threaten her pension.  Mr. Howard denies this, explaining that pensions are not administered by the union, but by a state agency, Michigan's Office of Retirement Services.

Mr. Howard then telephoned Superintendent Smith and asked whether he would accept Plaintiff's resignation.  Superintendent Smith agreed.  Mr. Howard then asked whether Plaintiff could be placed on Defendant's list substitute school bus drivers.  "Absolutely, we'd do that," Superintendent Smith recalls responding.  Smith Dep. 37:11.  Mr. Howard then relayed his conversation to Plaintiff.  And she faxed the following to Defendant:

> I, Cynthia A. Bimberg, resign my employment with Elkton-Pigeon, Laker Schools, effective today, December 18, 2009.  I appreciate all the consideration given me enabling me to spend time with my husband due to his illness.

Def.'s Mot. Ex. 10.  Defendant accepted the resignation.

On December 23, 2009, Plaintiff wrote a letter to the school board asking that the board "please disregard my previous letter of resignation dated December 18, 2009."  Def.'s Mot. Ex. 16.  She explained:

> I was advised by Mr. Bill Howard after he spoke with Mr. Robert Smith that I no longer had a position at Lakers.  He said that I needed to write a letter of resignation in order for me to save my pension. . . . This is why I put in my letter of resignation because I needed to save my 20 years of pension.  I [am] asking you to please disregard my previous letter of resignation because I would like to continue my employment with Lakers as it was before my leave of absence.  I believe that I was advised wrong by Mr. Howard.  Please consider my request for an extension.

*Id.* Plaintiff sent this letter to Mary Tait, a member of the board whom Plaintiff knew because Ms. Tait's child was on Plaintiff's former bus route. Ms. Tait, in turn, gave the letter to Superintendent Smith. "I told Mary at the time," Superintendent Smith recounts, "that the board had already accepted Ms. Bimberg's resignation and that the net impact of passing it out would change her status from resigned to terminated." Smith Dep. 25:14–17. He did not forward the letter on to the board.

In February 2010, Mr. Bimberg passed away. Plaintiff returned to Michigan. Several months passed. In October 2010, Plaintiff made a formal demand (via counsel) that Defendant place her on its substitute bus driver list. Def.'s Mot. Ex. 13. Superintendent Smith declined. In part, he explained:

> During the extended absence of Ms. Bimberg, the district has paid for the training of three new substitutes and there are now sufficient substitutes to easily meet our needs. Just for your information, Ms. Bimberg never expressed any interest in substitute driving from the time of her husband's death until her visit to apply in mid-October, 2010. And the district was sensitive to her loss. In fact, I personally attended her husband's memorial service.

*Id.* In his deposition, Superintendent Smith elaborated:

> Mr. Howard had simply said by phone, "If she resigns, would you consider putting her on our substitute list?" And I said, "Absolutely, we'd do that. Because at this point we have a shortage of subs. Three or four months later when you train three people, shortage didn't exist. . . . The district has [eight] subs. And you tend to call the subs who are most available because they're a hard job to keep, doesn't pay great so you try to keep a small group busy.

Smith Dep. 37:8–14, 39:15–18.

In January 2011, Plaintiff brought suit against Defendant. The single count in the complaint asserts that Defendant violated the Americans with Disabilities Act by discriminating against Plaintiff because of her association with a disabled person, her husband. Defendant now moves for summary judgment. ECF No. 12.

**II**

Summary judgment should be granted if the admissible evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must view all facts and draw all reasonable inferences in favor of the nonmovant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

**III**

This case, as with many employment discrimination cases, turns on a single question — indeed, a single word — why?  Why did Defendant end the employment relationship?  Was it because of discriminatory animus towards Plaintiff's husband's disability?  Or was it because Plaintiff did not report back to work when her extended leave of absence ended?

As noted, the Americans with Disabilities Act prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4);  *see Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1082 (10th Cir. 1997) ("A family relationship is the paradigmatic example of a 'relationship' under the association provision.");  *see also* 29 C.F.R. § 1630.8 ("It is unlawful for a covered entity to exclude or deny equal jobs or benefits to, or otherwise discriminate against, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a family, business, social or other relationship or association.").

This association discrimination provision, the Sixth Circuit recently observed, is "an infrequently litigated section of the Act."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482,

486 (6th Cir. 2011). Enacted in 1990, the Sixth Circuit did not address it in a published opinion until 2011. *Stansberry*, 651 F.3d at 486; *see Overley v. Covenant Transp., Inc.*, 178 F. App'x 488, 493–94 (6th Cir. 2006) (addressing association discrimination in unpublished opinion). To understand the provision, the court first looked to the legislative history, which illustrates the intended application through two examples:

> [A]ssume, for example that an applicant applies for a job and discloses to the employer that his or her spouse has a disability. The employer believes the applicant is qualified for the job. The employer, however, assuming without foundation that the applicant will have to miss work or frequently leave work early or both, in order to care for his or her spouse, declines to hire the individual for such reasons. Such a refusal is prohibited by this subparagraph.
>
> In contrast, assume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the spouse.

*Stansberry*, 651 F.3d at 486 (quoting H.R. Rep. No. 101–485, pt. 2, at 61–62 (1990)). "Importantly," the Sixth Circuit emphasized, "employers are not required to provide reasonable accommodations to non-disabled workers under this section of the Act." *Stansberry*, 651 F.3d at 486 (citing 29 C.F.R. § 1630.8 (2007), and *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004)).

Turning to the case law, the court noted that, as with other types of employment discrimination claims, plaintiffs may establish "association discrimination" through either direct or circumstantial evidence.[1] *Stansberry*, 651 F.3d at 487. "Direct evidence is evidence that, if

---

[1] The court in *Stansberry* also observed that "association discrimination" plaintiffs generally raise one of three theories: (1) "expense"; (2) "disability by association"; and (3) "distraction." 651 F.3d at 487 (citing *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir.2004)). The court explained that the "expense" theory involves "situations where an employee suffers an adverse employment action because of his or her association with a disabled individual covered under the employer's health plan." *Id*. The "disability by association" theory involves two situtations: when "the employer fears that the employee may contract the disability of the person he or she is associated with (for example the employee's partner is infected with HIV and the employer fears the employee may become infected), or the employee is genetically predisposed to develop a disability that his or her relatives have."

believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Here, Plaintiff offers two statements as direct evidence of discrimination. First, Plaintiff contends that in the fall of 2008 a fellow bus driver, Ms. Suttkus, "said that I purposely got Ken sick so I could have a vacation." Pl.'s Dep. 27:13–14. Second, Plaintiff asserts that in May 2009 Superintendent Smith "said something about, well, you have such a nice tan, must be great to go down south for the winter or something like that he said. I don't know his exact words." Pl.'s Dep. 28:18–21. Assuming that the statements were made (which the Court accepts for purposes of this summary judgment motion), neither is direct evidence of discrimination. Neither requires the conclusion that Defendant terminated Plaintiff's employment because of her husband's disability. Rather, each statement requires inferential leaps — from suggestion that Plaintiff was treating her husband's disability as a vacation, to an implied hostility to those who are not working (that is, those "on vacation"), to a latent hostility to anyone who is not capable of working (that is, the disabled), to the conclusion that Defendant terminated Plaintiff's employment because of discriminatory animus towards Plaintiff's association with a person who

---

*Id.* And the "distraction" theory involves "the employee's being somewhat inattentive at work because of the disability of someone with whom he or she is associated." *Id.* The court cautioned, however, that the three theories are "not necessarily an exhaustive list." *Id.* As Plaintiff's claim does not fit into any of the three theories, the discussion is relegated to this footnote.

was not able-bodied and working.[2]  Piling inference on inference in this manner is not direct evidence of discrimination.  It is its antithesis.  Accordingly, Plaintiff must establish her claim, if at all, through circumstantial evidence under the *McDonnell Douglas* framework.  *See Stansberry*, 651 F.3d at 487 (citing *Den Hartog*, 129 F.3d at 1085).

In *Stansberry*, the Sixth Circuit established the following four elements for a prima facie case of associational discrimination based on circumstantial evidence:

> (1) the employee was qualified for the position; (2) the employee was subject to an adverse employment action; (3) the employee was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision.

651 F.3d at 487.  Here, the fourth factor is dispositive.  The undisputed evidence establishes that Defendant's decision was made because Plaintiff did not return to work when ordered to, violating a neutral employer policy concerning attendance.  And Plaintiff offers no evidence that her husband's disability factored into Defendant's decision.

*Overley v. Covenant Transport* is particularly instructive.  The plaintiff was a truck driver with a severely disabled daughter.  178 F. App'x at 490.  After refusing to report to work for one shift because she was caring for her daughter, the plaintiff was terminated.  She brought suit alleging association discrimination.  *Id*. at 490–91.  The district court granted the employer summary judgment and the Sixth Circuit affirmed, explaining:

> Unlike a claim brought by a disabled person, an employer is not required to reasonably accommodate an employee based on her association with a disabled person.  Thus, Overley cannot claim that Covenant discriminated against her by not granting her sufficient time off or allowing her to modify her schedule so that

---

[2] Because reasonable accommodation need not be made under the Act's association provision, of course, using these alleged statements to suggest that Defendant discriminated against Plaintiff because she missed work is insufficient.  Rather, Plaintiff must show that Defendant discriminated against Plaintiff because of discriminatory animus towards her husband's disability.

>   she could care for her daughter. An employee who cannot meet the attendance requirements of her job is not protected by § 12112(b)(4). Courts have surmised that an employee would be protected under the statute if the employee was only distracted at work, but did not require a reasonable accommodation, or if the employer's decision was based solely on an unsubstantiated belief that the employee would have to miss work because of the association. Neither of these scenarios is applicable to the case at hand. Covenant did not base its decision on a belief that Overley would have to miss work to care for her daughter, but rather on her record of declined shifts and the absence on January 4.

Id. at 493 (citing 29 C.F.R. § 1630.8, *Den Hartog*, 129 F.3d at 1084–85, and *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)).

As in *Overley*, in this case Plaintiff was not merely "distracted" at work. She was not at work. She was absent — an excused absence for twelve months, an unexcused absence thereafter. Defendant did not make its decision "based solely on an unsubstantiated belief that the employee would have to miss work because of the association." Rather, in making its decision Defendant drew on a year of experience and Plaintiff's own statements to Superintendent Smith.[3] As in *Overley*, Plaintiff did not meet the attendance requirements of her job and so does not establish an association discrimination claim.

Reinforcing this conclusion is *Tyndall v. National Education Centers, Inc.*, 31 F.3d 209 (4th Cir. 1994), relied upon by the Sixth Circuit in *Overley*. *See Overley*, 178 F. App'x at 493–94. In *Tyndall*, the court found that the employer did not violate the association discrimination provision when it terminated the plaintiff's employment because of her frequent absences "caused by her personal need to tend to her son's disability, which an employer is not obligated to accommodate through scheduling modifications." 31 F.3d at 214. The court explained that although "an employer may not make decisions based on the belief that the employee would

---

[3] In September 2009, for example, Plaintiff recalls she informed Superintendent Smith "that Ken had to be down in to Texas. He was going to be under two chemo therapies and we're required to stay there for six months." Pl.'s Dep. 49:22–24.

have to miss work in order to take care of a disabled person," the defendant "did not make an unfounded assumption that [the plaintiff] would have to miss work to take care of [her son]. Rather, [the defendant] responded to [the plaintiff's] record of extended absences in connection with [her son's] care and her actual statement that she would, in fact, have to miss additional work in order to be with her son." *Id*. (internal alterations and quotation marks omitted) (quoting 29 C.F.R. § 1630, App).

In this case, as in *Tyndall*, in making its decision Defendant was responding to Plaintiff's record, not making unfounded assumptions about Plaintiff's future conduct. As in *Tyndall*, Plaintiff has not established an association discrimination claim.

In sum, Plaintiff has not raised a reasonable inference that the disability of the relative was a determining factor in the decision. Rather, the only reasonable inference from the evidence advanced by the parties is that Defendant acted because Plaintiff did not report back to work after a year-long leave of absence. Defendant is entitled to judgment on Plaintiff's claim.

Seeking to avoid this conclusion, Plaintiff offers the alleged statements of Mr. Smith and Ms. Suttkus as circumstantial evidence of "a discriminatory atmosphere surrounding Defendant's decision to terminate Plaintiff's employment." Pl.'s Resp. to Def.'s Mot. Summ. J. 19, ECF No. 15 ("Pl.'s Opp'n"). "Defendant created a discriminatory atmosphere," Plaintiff reiterates, "in the context of discussing Plaintiff's attempts to return to work." Id. at 20.

Plaintiff's argument is unpersuasive. Each statement simply suggests that the speaker resented the extensive time off Plaintiff was taking. The statements do not suggest, however, that either speaker harbored discriminatory animus towards Plaintiff's husband's disability. Contrary to Plaintiff's contention, moreover, the statements were not made during any "attempts to return to work." Quite the reverse, in fact. Ms. Suttkus is alleged to have made the remark in

-16-

the fall of 2008, while Plaintiff was working. Superintendent Smith is alleged to have made the remark in May 2009, when Plaintiff was requesting that her leave of absence be extended — that is, when she was attempting to be further excused from work — not when she was attempting to return to work.

As an alternative argument, in her brief Plaintiff offers the names of four individuals that she contends "were provided leaves of absence in excess of a year."[4] These individuals included Diane Wicker, Carol Suttkus, Brian Nickols, and Michele Shier. These individuals did not have the similar association with a disabled individual." Pl.'s Opp'n 20 (internal citation omitted). Plaintiff's assertion, however, is contradicted by her own deposition testimony. *See* Pl.'s Dep. 55:1–59:8. Regarding Diane Wicker, for example, Plaintiff first testified Ms. Wicker was granted a two year leave of absence, only to recant, testifying haltingly: "Diane Wicker for one year, leave of absence was personal and I'm not sure what she had." Pl.'s Dep. 57:4–5. Regarding Ms. Suttkus, Plaintiff again acknowledged that the leave was for one year, testifying: "Carol Suttkus was off for a lung thing for a year." Pl.'s Dep. 58:24–25. She continued:

> [S]he was off for a lung thing, and then she was off to visit her son in Germany.
> Q: For a year?
> A: For a couple months and then she had a week later [sic] because she didn't give them documents so they made her come back early.
> Q: She came back early?
> A: Uh-huh.

---

[4] In passing, it should be observed that Plaintiff, in developing the factual background, devotes considerable energy to the question of when she believed the parties agreed her leave of absence would end. In her legal argument, however, Plaintiff implicitly concedes that Defendant's actions on December 18 are not in themselves evidence of discrimination. Likewise, in her facts Plaintiff discusses her attempts to be placed on Defendant's substitute drivers list, but again implicitly concedes in her argument that Defendant's actions are not evidence of discrimination. Accordingly, although these factual contentions are recited above, they are not analyzed in this section.

Pl.'s Dep. 56:3–10. Plaintiff did not elaborate on Mr. Nickols's leave, aside from asserting it was for "health reasons." Pl.'s Dep. 57:4. Regarding Ms. Shier, Plaintiff acknowledged that the leave was not continuous, testifying: "Michele Shier had almost two years of leave, but she did leave or come back for about four months of it . . . . She was a new hire that found out that she had cancer." Pl.'s Dep. 58:4–8. Contrary to Plaintiff's contention, her testimony regarding these individuals does not allege "circumstances from which a reasonable jury could infer discrimination." Pl.'s Opp'n 21. Rather, the only reasonable inference from the evidence is that Defendant terminated Plaintiff's employment because she did not report back to work when her extended leave of absence ended. Defendant is entitled to summary judgment.

## IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 12) is **GRANTED** and Plaintiff's complaint is dismissed with prejudice.

It is further **ORDERED** that the hearing scheduled for Tuesday, February 21, at 4:00 p.m. is cancelled because the parties' papers provide the necessary factual and legal information to decide the motion. *See* E.D. Mich. L.R. 7.1(f)(2).

                                                s/Thomas L. Ludington  
                                                THOMAS L. LUDINGTON  
                                                United States District Judge

Dated: February 15, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 15, 2012.

                            s/Tracy A. Jacobs  
                            TRACY A. JACOBS